1

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
## CIVIL DIVISION

| | |
|---|---|
| Johana Colon, Christine Rundberg, and Anthony Womack on behalf of the Advanced Diagnostic Group Employee Stock Ownership Trust, | Case No.: |
| Plaintiffs, | **COMPLAINT** |
| Moore & Van Allen, PLLC, and Michael E. Zeller, | |
| Defendants. | |

## <u>NATURE OF THE ACTION</u>

1.       This lawsuit concerns egregious violations of legal ethics by counsel of the Advanced Diagnostic Group ("ADG") Employee Stock Ownership Trust ("ESOT" or "Trust"),[1] who had personal financial investments that placed him directly adverse to the ESOT.

2.       Defendant Michael E. Zeller of Defendant law firm Moore & Van Allen, PLLC ("MVA") was retained to serve as counsel to the Trust by advising its outside trustee, GreatBanc Trust Co. ("GreatBanc"). The first task for GreatBanc and MVA was to negotiate the ESOT's purchase of ADG. Unbeknownst to GreatBanc, the ESOT, or its beneficiaries, Zeller was part owner of the ADG sellers' financial advisor, ButcherJoseph & Co. ("ButcherJoseph"). ButcherJoseph had handpicked Zeller and his firm MVA to serve as counsel to the ESOT knowing that Zeller would defer to the sellers' interests, sign off on deals that were not in the ESOT's best interests, turn a blind eye to glaring red flags, and ensure that ButcherJoseph's client came out better than MVA's client in the deal.

---

[1] An employee stock ownership plan (ESOP) is a retirement plan and the ESOT is the legal trust that holds the ESOP's shares on behalf of employees. An ESOT implements and is part of an ESOP.

1

3.      As it turns out, the ESOT was created, operated, and terminated as part of a complicated corporate heist involving shell companies and corporate theft by ADG's own directors and officers in a scheme that was conceived by ButcherJoseph and facilitated by Zeller. In December 2015, ADG's owners sold ADG to the ESOT for $62 million. Throughout the ESOT's existence, ADG's resources, capital, referral sources, and staff would be used to grow outside shell companies owned by ADG's directors and officers. In May 2019, ADG and the shell companies would be sold to a public company, Akumin, in a bundled transaction for $212 million. The ESOT and its beneficiaries would receive only $10 million (representing a $1.25 million loss on employer contributions) while warrant and note holders—which included the original sellers and a ButcherJoseph affiliate, Mosaic, in which Zeller also invested–and ADG's directors and officers walked away with the rest.

4.      The only independent party that could have intervened and protected the ESOT was the outside trustee. But that trustee was relying on the legal and transactional advice of Zeller, who had every incentive to ensure that the ESOT's interests were undermined in favor of his financial partners and their clients.

5.      Plaintiffs now bring suit on behalf of the ESOT to recover the value it would not have lost had it been zealously represented by loyal counsel.

## PARTIES AND RELEVANT THIRD PARTIES

6.      The ESOP was an employee benefit plan, sponsored by ADG Acquisition Holdings Inc., a Florida corporation. The ESOT was established as part of the ESOP on December 8, 2015, and terminated on May 31, 2019 to hold the ESOP's assets on behalf of Plan participants. The ESOP's purpose was to invest in ADG stock as a retirement benefit for participants, who were ADG employees.

7.      Plaintiff Johana Colon is a natural person residing in Tampa, Florida. She worked

2

for ADG as an X-ray Technologist and MRI Technologist during the ESOT period and was a beneficiary of the Trust.

8.     Plaintiff Christine Rundberg is a natural person residing in Orlando, Florida. She worked for ADG as a front desk clerk from the start of the ESOT period until around May 2017 and was a beneficiary of the Trust. She was formerly known as Christine Chong.

9.     Plaintiff Anthony Womack is a natural person residing in Tampa, Florida. He worked for ADG as a Lead MRI Technologist throughout the ESOT period and was a beneficiary of the Trust.

10.     GreatBanc Trust Company is an Illinois corporation headquartered in Lisle, Illinois. GreatBanc was the ESOT trustee throughout the ESOT period.

11.     Moore & Van Allen PLLC is a North Carolina law firm headquartered in Charlotte, North Carolina. MVA was counsel to the Trust by advising its trustee, GreatBanc, in ESOT that capacity.

12.     Michael E. Zeller is a partner at MVA and co-head of the firm's ESOP Transactions practice. Zeller led MVA's engagement as counsel to the Trust. ESOT. Zeller was also an investor in ButcherJoseph and its affiliated private capital firm, Mosaic Capital Investors I, LP ("Mosaic"), during the relevant period. He is licensed to practice law in North Carolina and New York.

13.     ButcherJoseph & Co. is a Delaware corporation headquartered in St. Louis, Missouri. It describes itself as a financial advisor that specializes in advising "privately held businesses on ownership succession transactions." Mosaic is affiliated with ButcherJoseph by common ownership and control.

## STANDING

14.     Plaintiffs bring this action derivatively on behalf of the Trust. Plaintiffs are all

beneficiaries of the ESOT. Defendants' actions reduced the value of Plaintiffs' interests in the ESOT, ultimately reducing the distributions received from the Trust by Plaintiffs. As the Trust's trustee, GreatBanc had a fiduciary duty to enforce claims on behalf of the trust, including bringing actions to enforce the interests of beneficiaries. Restatement (Second) of Trusts § 177.

15.    GreatBanc refused to bring suit on behalf of the Trust against MVA and Zeller despite the Trust possessing meritorious claims against them, in breach of its fiduciary duty to bring litigation to advance the interests of and protect the trust beneficiaries. When the trustee is improperly failing or refusing to act, beneficiaries have standing to step in and act to protect the trust. *Id.* §§ 177, 282(2); Restatement (Third) of Trusts § 107(2); *id.*, cmt. c.; *Roller v. Collins*, 373 So. 3d 35, 42 (Fla. 5th Dist. Ct. App. 2023) (requiring satisfaction of the Restatement's criteria for trust beneficiary for standing under Florida common law); *Rollins v. Rollins*, 790 S.E.2d 157, 165 (Ga. App. 2016) (recognizing that beneficiaries have standing to sue third parties whose actions harm the trust where the trustee "improperly refuses or neglects" to maintain the suit).

16.    On November 10, 2023, Plaintiffs asked GreatBanc to sue Defendants for legal malpractice on behalf of the trust. On December 1, 2023, GreatBanc declined to do so. Because GreatBanc has neglected and subsequently declined to act, Plaintiffs as beneficiaries have standing to do so now.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this court pursuant to Fla. Stat. Ann. §§ 34.01 and 26.012 because this is a civil action seeking damages in an amount greater than $50,000.

18.    Venue is proper in this circuit pursuant to Fla. Stat. Ann. § 47.011 because the ESOT was administered in this circuit and the injuries caused by Defendants' ethical violations occurred in this circuit.

4

19.     Florida law governs this action because the trust and Trust were administered in Florida, the majority of the trust beneficiaries reside in Florida, the harms of Defendants' malpractice were felt in Florida, and the majority of the Trust's contracts and transaction documents reviewed by Zeller and entered into by the Trust specified Florida law as the choice of law. Thus, Zeller's engagement primarily required the application of Florida law, more so than any other jurisdiction.

## STATUTE OF LIMITATIONS

20.     On September 26, 2023, GreatBanc and Plaintiffs (through Counsel) learned in a deposition of Zeller that he was adverse to the ESOT at the time of its formation, throughout its operation, and at its termination.

21.     Zeller's conflicts of interests had been concealed from both GreatBanc and Plaintiffs. Plaintiffs could not have discovered this conflict prior to this date, even with the exercise of due diligence. Fla. Stat. Ann. § 95.11; *see also Green v. Bartel*, 365 So. 2d 785, 788 (Fla. 3rd D.C.A. 1978) ("Whether the plaintiff discovered, or by due diligence should have discovered the existence of the cause of action at some time more than two years prior to the date of the filing of her complaint was a question of fact and it has been held that genuine issues relating to such question of fact are to be determined by the trier of facts, and are not to be resolved on summary judgment.").

22.     After GreatBanc declined to bring suit against Defendants, Defendants, Plaintiffs, and GreatBanc entered into a tolling agreement that provided that "[a]ny and all statutes of limitations or repose applicable to the [transactions described herein] that the Trustee, ESOT, or Plaintiffs may have against [Defendants]" would be tolled for a period of 24 months beginning January 19, 2024.

## LEGAL BACKGROUND

23.     Under the North Carolina rules of professional conduct ("N.C. Rules") a lawyer is "subject to the disciplinary authority of North Carolina, regardless of where the lawyer's conduct occurs." N.C. Rules. 8.5(a). A "lawyer may be subject to the disciplinary authority of both North Carolina and another jurisdiction for the same conduct." *Id.*

24.     Florida rules explicitly prohibit lawyers from "entering into certain transactions or relationships with clients where there could be a conflict of interest, such as . . . engaging in business transactions without clear disclosures and consent." Fl. Rule 4-1.8; Restatement (Third) of the Law Governing Lawyers § 121, cmt. c. North Carolina's Rules of Professional Conduct are even more explicit and prohibit a lawyer from entering into a "business transaction . . . or acquir[ing] a pecuniary interest adverse to the client." N.C. Rule 1.8(a). "Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person, *or from the lawyer's own interests*." Fl. Rule 4-1.7(b), cmt.: Loyalty to a client (emphasis added). Accordingly, "[t]he lawyer's own interests should not be permitted to have adverse effect on representation of a client .... A lawyer may not allow related business interests to affect representation." Fl. Rule 4-1.7(b), cmt.: Consultation and consent.

25.     Disclosure and informed consent are critical to the attorney-client relationship. A client can waive a conflict of interest if the terms of the transaction are "fair and reasonable," the conflict is "fully disclosed in writing," the client is given the opportunity to seek "advice of independent counsel," and "the client gives informed consent in writing." N.C. Rule 1.8 (a)(1)-(3); *see also* Fl. Rule 4-1.7(b). A client's informed consent of a potential conflict must be "informed" such that the client "fully understand[s] the nature of the conflict and its implications." It must be in writing. Fl. Rule 4-1.7(b)(4); *see also* N.C. Rule 1.8(a)(3). Lawyers

6

must explain matters to clients to the "extent necessary to allow clients to make informed decisions about their representation." Fl. Rule 4-1.4; *see also* N.C. Rule 1.8(a).

26.     Because a law firm partner acts as an agent of the firm, a law firm is vicariously liable for acts of professional malpractice by that agent committed within the scope of their duties. *Dingle v. Dellinger*, 134 So. 3d 484, 492 (Fla. 5th Dist. Ct. App. 2014).

## FACTUAL BACKGROUND

### I.      BACKGROUND ON LEVERAGED ESOPS

27.     ESOPs offer benefits to employees, the company, and the selling shareholders. For employees, an ESOP is a retirement plan that grants them a stake in the company. Essentially, it's a benefit where employees receive shares turning them into part-owners. The rationale behind an ESOP lies in fostering employee motivation and loyalty, as having a vested interest in the company's success aligns employees' efforts with the company's growth. Moreover, if the firm prospers, the stock value increases offering tangible financial incentive to the employees. Effectively implemented, ESOPs can offer a rewarding retirement investment for employees.

28.     For the company, an ESOP provides for enables substantial tax savings. When an ESOP-owned company elects to be treated as a Sub-Chapter S Corporation ("S Corp.") it no longer pays federal income taxes. This creates a remarkable competitive advantage whereby the tax savings can be reinvested back into the business to fuel growth by purchasing new equipment, hiring more employees, repaying debt, or making distributions to the ESOP.

29.     Finally, for the existing shareholders, creating an ESOP allows deferment of capital gains on their ownership interest in the sale. These tax savings can be significant and are often the primary motivator for an owner to consider a sale to an ESOP. Creating an ESOP can therefore be an attractive exit strategy for a business owner.

7

30.     At the core of the growth of the ESOP industry is the leveraged ESOP. In a leveraged ESOP transaction, the ESOP borrows money from the company to purchase company stock. These transactions are unique to ESOPs.

## II.     THE ROLE OF AN ESOT TRUSTEE AND ITS COUNSEL

31.     In an ESOT formation transaction, the workers who stand to acquire company stock are not direct parties to the transaction. Instead, they are represented by an "ESOT trustee" who serves as an advocate, retained and paid to represent the interests of ESOT beneficiaries. It is the trustee's duty to act exclusively for the benefit of the ESOT and negotiate to complete a transaction at the lowest possible price with adequate protections in place to protect the ESOT's investment.

32.     Effective ESOTs are characterized by a vigilant and involved trustee who adheres to their fiduciary duties and prioritizes the trust and its beneficiaries' interests. The trustee is expected to act as an impartial third-party purchaser, steadfastly aiming to negotiate the lowest possible price, counterbalancing the typical seller's goal of obtaining the highest price. A trustee must be willing to walk away from a deal to avoid causing the ESOT to pay more than fair market value for the company stock, even if walking away might be adverse to the trustee's own business interests. The trustee's role involves a thorough examination of the valuation of a business and the potential for the business to generate a favorable investment return for the prospective ESOT.

33.     Trustees in turn often hire legal counsel to advise them on the exercise of their fiduciary duties and in reviewing potential transactions, including not only the sale agreement but also concurrent and contingent arrangements related to financing, managing, or selling the company after the ESOT invests. As the legal advisor to the independent fiduciary of the ESOT, it is expected that the trustee's counsel will not have interests that conflict with the ESOT.

8

Likewise, attorneys' ethical obligations require attorneys to ensure they do not have interests that are adverse to their clients. The ESOT's legal counsel must ensure that all processes required by law to protect the ESOT are followed competently and in good faith. The ESOT's legal counsel must also advise the ESOT trustee of risks faced by the ESOT, and the legal means available to curtail those risks, or remedy harm done to ESOT.

34.    ESOT counsels typically play a substantial role in ESOT transactions and make decisions that are given only a cursory review and approval by the trustee. It is typical for the ESOT's attorney to spend as much or more time on a transaction than the trustee itself.

## III.    THE ROLE OF INVESTMENT FIRMS LIKE BUTCHERJOSEPH

35.    Because of the tax savings associated with selling to an ESOT and the significant degree of control sellers may enjoy in such transactions, there is an industry of advisors and consultants who are experienced with leveraged ESOT transactions. Such professionals often describe themselves as investment bankers and financial advisors and assist businesses in crafting and closing these complex financial transactions. Importantly, they represent the sellers and work to ensure the sellers receive the best price and most favorable terms, often at the expense of the ESOT.

36.    ButcherJoseph is one such consultant that provides ESOP transaction advice to sellers. ButcherJoseph describes itself as a financial advisor that specializes in advising "privately held businesses on ownership succession transactions." ButcherJoseph specializes in ESOP transactions, maintaining a robust pipeline of ESOPs referred to by law firms, tax advisors, lenders, and other equity investors.

37.    ButcherJoseph's affiliate, Mosaic, is "an employee ownership focused private equity firm, investing in lower middle market companies ranging from $3 to $12 million of EBITDA . . . . Mosaic leverages its principals' unique expertise in Employee Stock Ownership

9

Trusts (ESOTs) to structure each transaction as an ESOT buyout."

38.     One way that ButcherJoseph tilts the field in sellers' favor is including warrants in ESOT formation transaction financing. Warrants are contracts that give sellers the right to purchase shares in the future at a predetermined price, thereby diluting the ESOT's stake in a future sale. In a leveraged transaction, the seller (through its advisor like ButcherJoseph) may exercise substantial control over the financing the buyer (*i.e.*, the ESOT) must use to acquire the company, and the trustee's approval of that financing.

39.     ButcherJoseph's business model does not end with the formation of the ESOT, for which it is paid a fee based on a percentage of the funds that it helps raise for the deal. The greatest potential for growth is realized when the owners of ButcherJoseph can position their direct investment arm, Mosaic, to invest in the deal through acquisition of some or all of the warrants or seller's notes, giving them a future stake in the newly formed ESOT-owned company.

## FACTUAL ALLEGATIONS RELATED TO THE ADG ESOT

### I.    ADG ESOT

40.     The ESOT was officially formed on December 8, 2015. The ESOT purchased all of ADG's common stock from the sellers based on an enterprise valuation of around $80 million in a leveraged transaction that closed three days later on December 11, 2015. In exchange for their shares, the sellers received notes carrying 12% interest and the primary seller separately received warrants to purchase up to 40% shares of ADG stock in the future.

41.     Over the ESOT's 3.5-year existence, ADG made $11.69 million in contributions to participants' accounts. On May 31, 2019, the ESOT was terminated when ADG was sold to Akumin, along with multiple shell companies created by the original sellers to divert value from ADG after the ESOT was formed, for around $212 million up front, plus at least $12 million

10

more in future earnout payments and other revenue distributions. The ESOT received only $10.4 million of this haul, representing a net loss on contributions made to the ESOT. The original sellers and their investment partners, note and warrant holders, company officers and directors, and Mosaic made off with the rest.

## II.    NATURE OF MALPRACTICE

### A. Zeller's undisclosed conflict of interests

42.    Because of the complex and specialized nature of leveraged ESOT transactions, trustees like GreatBanc rely heavily on their outside valuation advisor and legal counsel, who frequently specialize in transactions such as leveraged ESOTs. This was particularly true here, as the transaction involved a host of concurrent and contingent agreements, including employment contracts for the sellers, seller notes, warrants, an investor rights agreement, a shareholder management services agreement, change of control provisions, and non-compete provisions.

43.    MVA has extensive experience in ESOT formation transactions and Zeller is the practice group's co-head.

44.    Unbeknownst to the trustee, at the time of the ESOT formation transaction, Zeller was a shareholder of ButcherJoseph and a partner in Mosaic.

45.    Zeller and ButcherJoseph had a scheme wherein ButcherJoseph would recommend to its clients which trustee to hire for the ESOTs that they wanted to create and which outside counsel the trustee should retain. This resulted in significant legal work for Zeller and fees for MVA. In turn, Zeller provided legal advice to the ESOTs that resulted in the ESOT agreeing to terms that were highly unfavorable to its own pecuniary interests and were highly favorable to ButcherJoseph's clients, which in turn benefited ButcherJoseph and Mosaic.

46.    Soon after the ESOT formation transaction in December 2015, Mosaic completed its investment in ADG through the acquisition of part of the notes and warrants held by the

11

primary seller. Zeller had an ownership interest in ButcherJoseph and the Mosaic at the tie of the

ESOT formation transaction, during the operation of the ESOT, and at the time of the ESOT

termination transaction.

**B. The Scheme to Defraud the ADG ESOT and Zeller's Role in Perpetrating or Facilitating It**

**1. ESOT formation transaction**

47.      Even before the ESOT formation transaction, the ADG sellers had already begun

their scheme to defraud the ESOT. SFL Radiology Holdings LLC ("SFL") and Elite Radiology

of Georgia LLC ("Elite") were shell companies created shortly before the ESOT formation

transaction closed—but after the sellers started working with ButcherJoseph on the deal—owned

by certain ADG directors and their investment partners directly or through agreements granting

them control and profits. While ButcherJoseph was working with the sellers to create the ESOT

and sell ADG to it, the sellers structured new ADG business deals through SFL and Elite to

cause future profits generated by ADG after the ESOT was created to be retained by themselves

through SFL and Elite and not ADG.

48.      Zeller was responsible for performing due diligence on the formation transaction

and declined to investigate or question—and indeed, he tolerated—the sellers' creation of shell

companies to capture future profits and growth of ADG. He reviewed and signed off on abusive

arrangements between SFL and ADG and, according to one of the sellers, was also aware of the

sellers' creation of Elite.

49.      Zeller further reviewed and approved an employment agreement with ADG's

CEO that provided inadequate protection against future usurpation of ADG business

opportunities and diversion of ADG's resources for the benefit of himself through shell

companies.

12

50.     With minimal inquiry, diligence, or scrutiny into the nature of the transaction, concurrent and contingent arrangements related to future profits, and post-transaction operations or oversight, Zeller recommended to GreatBanc that it approve the ESOT's purchase of ADG and all related agreements, which it did. This was a big win for the clients of Zeller's financial advisory firm, ButcherJoseph, but a big loss for the client of his law firm, MVA.

### 2.  ADG's subsequent acquisition of its own imaging center from sellers

51.     After the ESOT was formed, GreatBanc continued as the ESOT's trustee. In that role, GreatBanc retained responsibility for annual valuations, for bringing litigation when necessary to protect the ESOT, to attend all shareholder meetings of the Company, and to perform any and all other acts in its judgment necessary or appropriate for the proper and advantageous management, investment, and distribution of the Trust's asset, ADG stock, for the benefit of ADG employees.

52.     During the time of the ESOT's existence, Zeller reviewed two related-party transactions on behalf of the Trust for GreatBanc. These transactions involved the original sellers and directors of ADG and officers of ADG and therefore conflicts of interest were prevalent. Zeller, as the ESOT's counsel, was the only disinterested party that could scrutinize the proposed deals. And yet his diligence was far from what one would expect for an arms-length transaction, much less a related-party one.

53.     The first related-party transaction in May 2017, concerned the ESOT's acquisition of an imaging center that the original sellers had purchased through SFL just two months before the ESOT was formed using ADG's money for around half of the equity capital, which they thereafter operated under the ADG name. *See supra* ¶ 47. The sellers, through SFL, now proposed to sell ADG that center ESOT at a 300% markup, even though ADG's own capital, resources, referrals, and staff had been used to acquire, grow, and operate the center.

13

54.     This acquisition was presented to Zeller at the very last moment and Zeller appears to have undertaken minimal diligence. Yet Zeller still greenlit the deal despite having only one business day to conduct his diligence.

55.     Zeller could have asked for additional time to adequately review the deal but he did not. With minimal scrutiny of the nature of the business being "exchanged" and the legal relationships that governed the venture, Zeller should have uncovered that the imaging center had been stolen from ADG by SFL, and that the remarkable growth of this imaging center was largely due to its use of ADG's intellectual property, employees, processes, operations, and assets, without adequate compensation to ADG.

56.     Zeller should have identified this as a form of corporate theft. Given the self-dealing nature of the transaction, a closer examination of SFL's owners and their activities in this joint venture was essential. Such scrutiny would have made clear that ADG was in fact being exploited by its CEO and board, warranting serious concerns and legal intervention.

57.     Other glaring deficiencies in the proposed deal likely would have been discovered had Zeller engaged in proper due diligence that an attorney pursuing the best interests of his client would have performed under these circumstances. For example, the assets purchased by ADG did not include the imaging center's accounts receivable. The deal also awarded other valuable assets to SFL including a mobile MRI machine with no apparent justification or further interrogation by Zeller. Had Zeller inquired whether any analysis of the financial fairness of the property allocation to SFL in the exchange had been done, the answer would have been no.

### 3.  ADG's waiver to allow ADG officers and directors to acquire a competing chain of imaging centers

58.     Another related-party transaction Zeller reviewed was ADG's consent to allow the original sellers and their investment partners to purchase a competing chain of imaging

centers called the Imaging Centers of West Palm Beach ("ICWPB") in Southeast Florida in their personal capacities through another shell company created in 2017 called TIC Acquisition Holdings LLC ("TIC"). This was notable for a few reasons: (1) the chain directly competed with ADG; and (2) it was an acquisition target of ADG.

59.     Zeller, on behalf of Trust for GreatBanc, was asked to approve this transaction because of the conflicts of interest presented by having ADG's management acquire a competing chain that ADG also wanted to acquire. Given the large barriers to entry in the imaging industry and Zeller's understanding that ADG's growth had been driven in large part by acquiring imaging centers and maximizing efficiencies through integration with ADG, Zeller should have closely scrutinized this proposed transaction.

60.     The original sellers conferred with ButcherJoseph on their idea to acquire ICWPB themselves. They resolved to represent to GreatBanc that ADG was unable to purchase the chain on its own, that the chain would not compete with ADG, and that their interests in the competing chain would be as mere passive investors. Zeller accepted all of these representations without question and sought no legal protections to ensure ADG would not be harmed by the deal. Zeller further declined to investigate whether adequate financial due diligence had been performed to support the self-serving representations that ADG was unable to acquire the chain for itself.

61.     In fact, the original sellers had already agreed to subordinate ADG's interests to those of their new shell company and had agreed that ADG would not expand into any new territories that would compete with ICWPB. This course of conduct included gifting themselves, through ICWPB and TIC, a new imaging center that ADG was already developing in Port St. Lucie. These one-sided transactions in favor of ButcherJoseph's clients were apparent from the deal documents that Zeller had available to him in connection with his consent to the transaction

15

on behalf of the ESOT. He declined to challenge these arrangements.

62.     Had Zeller cared to review financial due diligence, or lack thereof, regarding ADG's ability to purchase the chain on its own, he would have discovered that the original sellers had been managing ADG's cash and capital disloyally, and he would have advised GreatBanc to oppose, and take additional steps to unravel, the heist that was underway. The ICWPB transaction was the tip of an iceberg of disloyalty, usurpation, and corporate theft ongoing that hurt the ESOT's investment in ADG. A loyal attorney would have readily seen the threat to the ESOT's investment with minimal diligence and advised GreatBanc accordingly.

63.     The only measure Zeller took in approving the deal was asking for a right of first refusal for ADG to buy ICWPB if the original ADG sellers ever sold it. While this did nothing to protect the ESOT from ongoing diversion of resources, which continued with respect to ICWPB after the deal, or the loss of profit opportunity associated with the favorable price at which the original ADG sellers were buying ICWPB, it was not nothing. That is, until it was nothing, when Zeller declined to follow-up to ensure that the right of first refusal was ever documented.

### 4.  ESOT termination and sale to Akumin

64.     In 2019 ADG was sold alongside all interests in the various shell companies for a total sum of around $212 million up front plus future payments that totaled at least $12 million to a strategic buyer in the radiology space, Akumin. Upon this sale, the ESOT was terminated. Despite this apparent windfall, the ESOT received only $10.4 million in the deal.

65.     Just as he had at the ESOT formation transaction and throughout the ESOT's operation, Zeller failed to undertake diligence consistent with his duty as the Trust's counsel. These failures include (1) the failure to challenge the shell companies—the nature of those entities, their relationship with ADG,  the and allocation of value between ADG and the ESOT versus the shell companies; (2) the failure to challenge the means of structuring the transaction to

16

split value between the ESOT and warrant holders; (3) the failure to challenge unnecessary transaction bonuses to ADG's management; and (4) the failure to identify or bring to the trustee's attention to potential causes of action the Trust had against the original sellers, or to use the same to negotiate superior terms for the Trust.

66.     The conflicts of interests were numerous and immediately apparent. There was no reason for Zeller to accept that the deal was fair to ADG and ESOT as against ButcherJoseph's clients, who were now cashing in the value they diverted from the ESOT starting with the ESOT formation and continuing ever since. And yet, he advised GreatBanc to approve the deal, recommending no scrutiny of the nine-figure sum going to the original sellers and their investment partners through shell companies, bonuses, warrants, and notes.

67.     Despite having a minimal understanding of the nature of the Akumin transaction, Zeller never even demanded to learn the prices Akumin would be paying for the shell companies. Indeed, even though the trustee requested information about these entities, those requests were declined or ignored without consequence. If Zeller was requesting information he deemed vital to understanding and evaluating whether appropriate procedures and protections were employed in structuring the transaction, and the self-interested directors and management at ADG were refusing to provide that vital information, Zeller should have recommended that the Trust (1) insist on reviewing this information before approving the Akumin sale, and (2) be concerned about the loyalties of ADG management.

68.     Despite numerous warning signs, Zeller inadequately challenged the fundamental structure of the transaction proposed by the original sellers. Zeller recommended the trustee approve the deal after superficially conducting negotiations over the allocation of only $2 million to $3 million of the total proceeds, which in reality did little more than endorse the overall

17

structure proposed by the original sellers. This approach overlooked the broader, more consequential issues at play, failing to protect the ESOT's interests and providing a windfall to ButcherJoseph's clients from the unfair and abusive ownership and governance structure that ButcherJoseph and Zeller helped them set up.

69.    Zeller was personally invested in Mosaic, which by the time of the Akumin sale, held warrants in ADG. As Zeller testified in his September 2023 deposition, one of GreatBanc's duties was to "negotiate the allocation of the proceeds attributable to . . . ADG, amongst . . . . The ESOT, the debt holders and the warrant holders." Thus, as an investor in the fund holding warrants, Zeller was directly adverse to the ESOT, even as he was negotiating the allocation of proceeds on behalf of the ESOT. His superficial efforts to negotiate against the warrant holders are belied by the result, which ultimately allowed the warrant holders to be credited with around half of the equity value of ADG (minimized as it was by diversion of value to the shell companies) due to an excessively favorable change of control provision and structuring of the proceeds waterfall, which a loyal and prudent counsel for the ESOT would have been able to oppose to shift more value to the ESOT.

## COUNTS

### Count I
### Legal Malpractice

70.    Plaintiffs incorporate the preceding allegations as if set forth fully herein.

71.    Zeller represented GreatBanc in its capacity as trustee to the ESOT, which in turn represented the ESOT. This means Zeller's real client was the ESOT and its beneficiaries.

72.    Zeller had a duty of care to the ESOT and its beneficiaries. He also had a duty of loyalty and to provide legal advice that were solely in the interests of the ESOT and its beneficiaries.

73.     In reviewing the ESOT's acquisition of ADG, related-party transactions, and the sale of ADG to Akumin and the termination of the ESOT, Zeller and MVA failed to exercise due care and succumbed to their conflicts of interests.

74.     As a result of Zeller's and MVA's breaches of the duty of care and duty of loyalty, the ESOT received at least $85 million dollars less in proceeds from the operation of the ESOT and sale of its shares than it would have had the ESOT been capably represented by an attorney zealously advocating on its behalf.

75.     This additional money would have been paid to beneficiaries' accounts upon the termination of the ESOT, including the accounts of Colon, Rundberg, and Womack.

### **PRAYER FOR RELIEF**

a.     A determination by the Court that Zeller and MVA committed legal malpractice in its representation of the Trust;

b.     Monetary damages resulting from the acts of legal malpractice in an amount to be determined at trial;

c.     An award of pre- and post-judgment interest;

d.     An award of attorneys' fees;

e.     Distribution of the foregoing awards to Trust beneficiaries on a *pro rata* basis in proportion to their interests in the trust's assets at the time of the ESOT's termination; and

f.     Any other relief the Court considers just and equitable.


Date: April 11, 2025                    **WENZEL, FENTON, CABASSA, P.A.**
                                        /s/Brandon J. Hill
                                        Brandon J. Hill, FL No. 0037061
                                        Luis A. Cabassa, FL No. 053643
                                        Amanda E. Heystek, FL No. 0285020
                                        1110 N. Florida Avenue, Suite 300
                                        Tampa, FL 33602
                                        Telephone: (813) 224-0431

19

bhill@wfclaw.com
lcabassa@wfclaw.com
aheystek@wfclaw.com

**ENGSTROM LEE LLC**
Jennifer K. Lee, MN No. 0399012*
Carl F. Engstrom, MN No. 0396298*
323 Washington Ave. N., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
jlee@engstromlee.com
cengstrom@engstromlee.com

* *Pro Hac Vice* Forthcoming

ATTORNEYS FOR PLAINTIFFS

20